Case 20-05031-rlj Doc 23 Filed 01/12/22    Entered 01/12/22 09:23:13    Page 1 of 17



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 11, 2022**

_____
**United States Bankruptcy Judge**
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| REAGOR-DYKES MOTORS, LP,[1] | § | Case No.: 18-50214-RLJ-11 |
| | § | (Jointly Administered) |
| Debtors. | § | |
| | § | |
| DENNIS FAULKNER, as Trustee of the Creditors Trust, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 20-05031 |
| | § | |
| Broadway Festivals, Inc., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

---

[1] The following chapter 11 cases are jointly administered in Case No. 18-50214: Reagor-Dykes Imports, LP (Case No. 18-50215), Reagor-Dykes Amarillo, LP (Case No. 18-50216), Reagor-Dykes Auto Company, LP (Case No. 18-50217), Reagor-Dykes Plainview, LP (Case No. 18-50218), Reagor-Dykes Floydada, LP (Case No. 18-50219), Reagor-Dykes Snyder, L.P. (Case No. 18-50321), Reagor-Dykes III LLC (Case No. 18-50322), Reagor-Dykes II LLC (Case No. 18-50323), Reagor Auto Mall, Ltd. (Case No. 18-50324), and Reagor Auto Mall I LLC (Case No. 18-50325).

1

Plaintiff Dennis Faulkner, Trustee of the Reagor-Dykes Auto Group Creditors Liquidating Trust ("Trustee"), moves for summary judgment on his cause against Broadway Festivals, Inc. ("Broadway") for avoidance and recovery of a preferential transfer under §§ 547 and 550 of the Bankruptcy Code.[2]  Defendant Broadway Festivals, Inc. opposes the motion, asserting the defenses that the "transfer" was made as part of a contemporaneous exchange under § 547(c)(1) or made in the ordinary course under § 547(c)(2).

The Court has jurisdiction of this matter under 28 U.S.C. § 1334(b); this dispute is a core proceeding under 28 U.S.C. § 157(b)(2)(F).

After careful consideration of the pleadings, the summary judgment evidence, and arguments of the parties, the Court finds that the transaction here satisfies the ordinary-course exception to a preference under § 547(c)(2)(A) and denies the motion.

**Background**

Broadway, a 501(c)(3) charitable organization, annually hosts the "Fourth on Broadway" Independence Day fireworks show and celebration in Lubbock, Texas.  Each year, Broadway solicits financial support from local businesses and community organizations to cover the costs of the celebration and offers promotional benefits in exchange.  Reagor-Dykes Imports, LP d/b/a Reagor-Dykes Mitsubishi ("Reagor-Dykes"), one of the debtors in these jointly administered bankruptcy cases, agreed to sponsor the fireworks "extravaganza" for the 2018 Fourth on Broadway celebration.  For its sponsorship, Broadway placed the Reagor-Dykes logo on its print, online, and television advertisements; it provided Reagor-Dykes with VIP tickets to the event; and it allowed personnel of Reagor-Dykes an opportunity to address attendees and advertise at the celebration.

---

[2] Section (§) references refer to 11 U.S.C. unless otherwise stated.

Reagor-Dykes also sponsored the fireworks in 2017. Broadway invoiced Reagor-Dykes for its sponsorship of the 2017 fireworks on February 16, 2017, in the amount of $20,000 ("2017 Transfer"). Reagor-Dykes paid the invoice on May 24, 2017, well in advance of the celebration. Broadway invoiced Reagor-Dykes for its sponsorship of the 2018 fireworks on May 14, 2018, in the amount of $25,000 ("2018 Transfer"). Unlike in 2017, Reagor-Dykes paid the 2018 invoice on July 13, 2018, after the July 4 celebration.

On August 1, 2018, Reagor-Dykes filed its chapter 11 bankruptcy petition. On July 31, 2020, the Trustee filed his complaint against Broadway. ECF No. 1.[3] The complaint seeks to avoid the $25,000 payment made to Broadway for the 2018 Fourth on Broadway fireworks sponsorship, asserting that the payment is a preferential transfer.[4] On August 31, 2021, the Trustee filed this motion seeking summary judgment on his preferential transfer claim and the affirmative defenses asserted by Broadway.

## Discussion

### I. Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[5] "A fact issue is material if its resolution could affect the outcome of the action." *Peel & Co. v. Rug Mkt.*, 238 F.3d 391, 394 (5th Cir. 2001). The movant bears the initial burden of identifying portions of the pleadings and discovery that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the

---

[3] "ECF No." hereinafter refers to the numbered docket entry in Adversary No. 20-05031.

[4] The Court entered an order on December 10, 2020 that dismissed the Trustee's cause of action under § 548(a)(1)(A) for actual fraudulent transfers. ECF No. 12.

[5] Made applicable to bankruptcy proceedings under Federal Rule of Bankruptcy Procedure 7056.

movant does meet its burden, the nonmovant must go beyond the pleadings and designate specific facts showing that a genuine issue of material fact exists for trial." *Roberson v. Game Stop, Inc.*, 395 F. Supp. 2d 463, 468 (N. D. Tex. 2005), *aff'd*, 152 F. App'x 356 (5th Cir. 2005). On a preferential transfer action, when "the parties agree completely as to what payments were made[,]… when [they were made], and for what," the material facts are not in dispute. *Yaquinto v. Arrow Fin. Servs. (In re Brook Mays Music Co.)*, 418 B.R. 623, 625 (Bankr. N.D. Tex. 2009).

"[T]he court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence." *Peel & Co.*, 238 F.3d at 394. The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Id*.

## II. Preference Claim – § 547(b)

The Trustee argues he is entitled to summary judgment on his preference claim under § 547(b) to avoid the 2018 Transfer. Under § 547(b), a trustee may avoid a transfer of a debtor's interest in property if the transfer was:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made--
>     (A) on or within 90 days before the date of the filing of the petition; or
>     (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if--
>     (A) the case were a case under chapter 7 of this title;
>     (B) the transfer had not been made; and
>     (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

§ 547(b).

Reagor-Dykes's 2018 Transfer was made for the benefit of a creditor because it was made to Broadway in exchange for the benefits provided to Reagor-Dykes for its sponsorship. Reagor-Dykes made the transfer within the 90 days before it filed bankruptcy. Under § 547(f), Reagor-Dykes is presumed to have been insolvent at the time of transfer. And the $25,000 payment is more than Broadway would recover under chapter 7 had it not been paid. ECF No. 18 at 6. Broadway does not dispute these conclusions.

Broadway's sole objection to the Trustee's substantive preference claim is that the 2018 Transfer was *not* made on account of an antecedent debt. "A debt is *antecedent* for purposes of § 547(b) if it was incurred before the alleged preferential transfer." *Baker Hughes Oilfield Operations, Inc. v. Cage (In re Ramba, Inc.)*, 416 F.3d 394, 399 (5th Cir. 2005) (emphasis added). "[A] debt is *incurred* when the debtor becomes obligated to pay it, not when the creditor chooses to invoice the debtor for his work or goods." *Sandoz v. Fred Wilson Drilling Co. (In re Emerald Oil Co.)*, 695 F.2d 833, 837 (5th Cir. 1983) (emphasis added) (creating definition for § 547(c)(2) defense); *see also Southmark Corp. v. Marley (In re Southmark Corp.)*, 62 F.3d 104, 106 (5th Cir. 1995) (extending definition to § 547(b) claim); *Bass v. Sw. Bell Tel. Co. (In re Ray W. Dickey & Sons, Inc.)*, 11 B.R. 146, 147–48 (Bankr. N.D. Tex. 1980) (applying substantially same definition to § 547(b) claim). And a debtor is *obligated to pay* a debt when the debtor has received its consideration or when the creditor has performed services for the debtor. *In re Emerald Oil Co.*, 695 F.2d at 837; *In re Ray W. Dickey & Sons*, 11 B.R. at 147–48.

Broadway argues that there is a genuine dispute on the material facts of whether the 2018 Transfer was made on account of an *antecedent* debt. Broadway and the Trustee do not dispute when Reagor-Dykes was invoiced or when payment was made to Broadway. The only fact in dispute is when Reagor-Dykes received consideration for its payment, a fact essential to

5

determining when the debt was incurred. Broadway points to the 2018 Fourth on Broadway flyer as well as the affidavit of Don Caldwell, Broadway's CEO, to support its contention that Reagor-Dykes received consideration in the form of ongoing promotional benefits beyond July 4, 2018.[6] These items of evidence taken together show that some advertisements for Reagor-Dykes remained in public view for some time after July 4.

But whether Reagor-Dykes received some additional benefit beyond July 4 is not a *material* fact on the question of when the debt was incurred. Both the celebration flyer and Don Caldwell's affidavit make clear that the vast majority of benefits received on account of Reagor-Dykes's sponsorship occurred before or on July 4, that those benefits were what Reagor-Dykes bargained for, and that additional benefits lasting beyond July 4 were at most incidental.[7] The facts presented by both parties support the conclusion that Reagor-Dykes received its consideration on or before July 4, 2018, and that is the date when its debt was incurred, *regardless* of whether some incidental consideration was received after July 4. Importantly, despite its attempt to raise a factual issue, Broadway concurrently concedes this point, saying, "[a] debt is incurred when a party becomes legally bound to pay, … which was, in this case, when Reagor-Dykes received the services of Broadway on July 4, 2018." Broadway's Resp. at 5 [ECF No. 20].

Broadway also contends that the debt was not incurred on July 4 and thus is not antecedent because the 2018 Transfer and the services provided to Reagor-Dykes were "substantially contemporaneous," allowing Broadway a defense to avoidance under § 547(c)(1).

---

[6] The flyer was attached to both parties' summary judgment motions. The affidavit was attached to Broadway's motion.

[7] Promotional benefits, according to the celebration flyer, include presence on the event stage to address the audience, booth space in the vendor area, parade entry, logo on ads and webpages, live promotional interviews, and VIP tickets to the celebration.

But finding that a transfer is substantially contemporaneous does not necessarily mean that the transfer was not on account of an antecedent debt. "[Defendant's] argument conflates the 'antecedent debt' requirement of § 547(b)(2) with the 'contemporaneous exchange' exception of § 547(c)(1). The possibility that the latter might apply in this case does not affect [] analysis of the former." *Ramba*, 416 F.3d at 399.

A genuine issue of material fact does not exist on whether the 2018 Transfer was on account of an antecedent debt. The undisputed material facts reveal that Reagor-Dykes became obligated to pay Broadway for its sponsorship benefits no later than July 4, 2018, when the various benefits were conferred upon Reagor-Dykes. It paid the debt on July 13, 2018. The payment to Broadway was thus made on account of an antecedent debt.

The Trustee has shown through the undisputed material facts that the payment to Broadway meets each element of § 547(b). The Court next addresses whether the Trustee has shown he is entitled to summary judgment on Broadway's two § 547(c) affirmative defenses.

### III. "Contemporaneous Exchange" Defense – § 547(c)(1)

Broadway argues that summary judgment is not appropriate because the undisputed facts show that the 2018 Transfer was a "contemporaneous exchange for new value."[8] § 547(c)(1). Even if all the elements of § 547(b) are met, a transfer may not be avoided if it meets the elements of the "contemporaneous exchange for new value" preferential-transfer exception. *Id*. Under this exception, a trustee may not avoid a transfer that was: "(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact [was] a substantially contemporaneous exchange." *Id*. "The purpose of the contemporaneous exchange for new value defense is to

---

[8] Broadway has not argued that the facts are in dispute on this issue, and summary judgment is therefore appropriate if the Trustee has shown he is entitled to relief under the law.

encourage creditors to continue to deal with financially-distressed debtors, as long as their transactions involve true exchanges of equally-valued consideration." *Silverman Consulting, Inc. v. Canfor Wood Prods. Mktg. (In re Payless Cashways, Inc.)*, 306 B.R. 243, 249 (B.A.P. 8th Cir. 2004), *aff'd*, 394 F.3d 1082 (8th Cir. 2005).

Section 547(c)(1) is an affirmative defense on which the defendant bears the burden of proof. *Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.)*, No. 99-11401, 2000 WL 1741550, at *3 (5th Cir. Nov. 7, 2000). To succeed on a § 547(c)(1) defense, a defendant must prove (1) intent, (2) contemporaneousness, and (3) new value. *Id*.

### a. Intent

The undisputed summary judgment evidence demonstrates that the parties did not intend for the 2018 Transfer to be a contemporaneous exchange. "Courts determine the parties' intent by examining evidence of the parties' mutual understanding of the payment arrangement and evidence of how payments were reflected on the parties['] books." *Post-Confirmation Comm. v. Tomball Forest, Ltd. (In re Bison Bldg. Holdings, Inc.)*, 473 B.R. 168, 175 (Bankr. S.D. Tex. 2012). Broadway sent an invoice to Reagor-Dykes well in advance of the July 4 celebration and well before Reagor-Dykes made its payment.[9] Don Caldwell says that Broadway "bills [] local businesses in advance. However, the delivery of the event is not conditioned upon the receipt of payment." Aff. of Don Caldwell at 3 [ECF No. 20-1]. Broadway's transaction list reveals that it receives most of its payments from its contributors some time after it sends invoices. These facts make clear that the parties expected a gap between payment and consideration received and did not intend for a contemporaneous exchange. For this reason alone, Broadway's contemporaneous exchange argument fails.

---

[9] The invoice and the transaction list were attached to both parties' summary judgment motions.

### b. Contemporaneousness

Not only did the parties not intend for the 2018 Transfer to be a contemporaneous exchange, but the exchange also was not substantially contemporaneous in practice. A transfer need not be simultaneous to be substantially contemporaneous, and courts must undertake a case-by-case analysis to determine whether a transfer was substantially contemporaneous. *Newhouse v. Trizec Props., Inc. (In re Hencie Consulting Servs., Inc.)*, No. 03-39402, 2006 WL 3804991, at *2–3 (Bankr. N.D. Tex. Dec. 21, 2006). Courts should inquire "into all relevant circumstances—such as length of delay, reason for delay, nature of the transaction, intentions of the parties, and possible risk of fraud—surrounding an allegedly preferential transfer." *In re Bison Bldg. Holdings, Inc.*, 473 B.R. at 176.

Reagor-Dykes paid Broadway nine days after the July 4 celebration. Such a gap between payment and received-consideration means the transfer was not precisely contemporaneous, but it does not automatically preclude a finding that it was "substantially" contemporaneous. *See Hencie*, 2006 WL 3804991, at *2 (collecting cases). The facts here indicate the transfer was not substantially contemporaneous, however, because the delay in time for payment was not caused by unexpected or uncontrollable circumstances. The testimony of Don Caldwell indicates that a gap between payment and receipt of consideration was normal practice and common. His testimony also reveals that Broadway made no demand for payment by a certain date. The issuance of an invoice months in advance shows that Reagor-Dykes could have paid well before July 4, resulting in an even greater gap between consideration received and payment. The 2018 Transfer was not substantially contemporaneous, but instead was asynchronous and, at least by July 4, 2018, resulted in the creation of debt and of a debtor-creditor relationship.

### c. New Value

Broadway has failed to prove that the 2018 Transfer was made for new value received. For this element of the defense, a creditor must show the specific measure of new value received through the transfer. *Sherman v. OTA Franchise Corp. (In re Essential Fin. Educ., Inc.)*, 629 B.R. 401, 446 (Bankr. N.D. Tex. 2021); *Schulte Roth & Zabel*, 2000 WL 1741550, at *3. Broadway claims that "Reagor-Dykes benefited from the exposure of its name to the local public in association with the prestigious annual event" *after the July 4 event* and that the value of these benefits is "equivalent to the $25,000 payment." Broadway's Resp. at 7 [ECF No. 20]. Broadway provided no evidence that explains the nature or value of the post-July 4 benefits and thus failed to meet the element of new value. Broadway has failed to prove each of the necessary elements of its contemporaneous exchange defense.

### IV. "Ordinary Course of Business" Defense – § 547(c)(2)

Broadway argues that summary judgment is not appropriate because the 2018 Transfer was made "in the ordinary course of business."[10] § 547(c)(2). Even if all the elements of § 547(b) are met, a transfer may not be avoided if it meets the elements of the "ordinary course of business" preferential-transfer exception. *Id*. Under this exception, a trustee may not avoid a transfer:

> to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was--
> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
> (B) made according to ordinary business terms.

---

[10] Although Broadway says that the facts on this issue are in dispute, it does not dispute the evidence presented by the Trustee and relies solely on legal arguments.

*Id*. "The ordinary course of business defense provides a safe haven for a creditor who continues to conduct normal business on normal terms." *Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 160 (5th Cir. 2015) (quoting *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co., Inc. (In re Gulf City Seafoods, Inc.)*, 296 F.3d 363, 367 (5th Cir. 2002)).

Section 547(c)(2) is an affirmative defense, and the defendant bears the burden of proof. *Gulf City Seafoods*, 296 F.3d at 367. The defendant must show that the transfer meets either the subjective test of § 547(c)(2)(A) or the objective test of § 547(c)(2)(B) of the "ordinary course of business" exception. "[T]he objective test seeks to determine whether [the transfers] were 'ordinary in the industry.'" *Reed v. Walton (In re BFN Operations LLC)*, 607 B.R. 551, 561 (Bankr. N.D. Tex. 2018) (quoting *In re ACP Ameri-Tech Acquisition, LLC*, No. 09-90082, 2012 WL 481582, at *7 (Bankr. E.D. Tex. Feb. 14, 2012)). The subjective test examines whether the transfers were ordinary in light of "each party's respective practices." *In re C.W. Mining Co.*, 798 F.3d 983, 989 (10th Cir. 2015).

Broadway argues that the 2018 Transfer is subject to the "ordinary course of business" exception under the *subjective* test. This requires a "peculiarly factual analysis" of the business practices that are unique to the parties. *See Gosch v. Burns (In re Finn)*, 909 F.2d 903, 907 (6th Cir. 1990) (internal quotations omitted). And it raises the question whether a defendant-transferee can ever successfully claim the exception under the subjective test if there are no prior dealings between the parties. With a first-time transaction, there is no baseline history between the parties and arguably no way to prove that the transaction at issue is "ordinary" as between the parties. Indeed, a prior decision in this District has held that to analyze a transaction under the subjective test, a baseline transaction history between the debtor and the defendant spanning a length of time with a significant number of payments is necessary. *In re Kevco, Inc.*, No. 401-

11

40783-BJH-11, 2005 WL 6443621, at *12–13 (Bankr. N.D. Tex. June 30, 2005).[11] But Broadway relies on four circuit-level cases that contrarily hold that a single payment with no transaction history may be sufficient to establish the ordinary-course exception under the subjective test. *See Jubber v. SMC Elec. Prods. Inc. (In re C.W. Mining Co.)*, 798 F.3d 983, 989 (10th Cir. 2015); *Wood v. Stratos Prod. Dev., LLC (In re Ahaza Sys., Inc.)*, 482 F.3d 1118, 1125 (9th Cir. 2007); *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 642–43 (7th Cir. 2003); *Gosch v. Burns (In re Finn)*, 909 F.2d 903, 908 (6th Cir. 1990). The circuit court cases do not, however, invalidate the importance of a transaction history for a determination under the subjective test. The transaction here is not the first for the parties; from the evidence, it is the second. Besides the 2018 Transfer, the 2017 Transfer was the only other payment made by Reagor-Dykes to Broadway. This limited transaction history between the parties makes application of the subjective test more difficult; with just one prior transaction, minor differences between transactions—and thus Broadway's burden to prove the ordinary-course exception—are magnified.

For the particular facts and circumstances here—a debtor's transfer to a non-profit entity where the history between the two parties is limited—the Court agrees with those courts that have held that a defendant-transferee on a first-time transaction with the debtor may raise the ordinary-course exception under the subjective test. The Court will elaborate.

The broad purpose of the preference section of the Bankruptcy Code is to "promote equality of distribution among all creditors while simultaneously [deterring] creditors from 'racing to the courthouse to dismember the debtor during [its] slide into bankruptcy.'" *Kleven*,

---

[11] *Kevco* refers to § 547(c)(2)(B) as the subjective test; however, that is because the transfers there were made before § 547(c)(2) was amended, moving the subjective test from § 547(c)(2)(B) to § 547(c)(2)(A).

334 F.3d at 641 (quoting *Union Bank v. Wolas*, 502 U.S. 151, 161 (1991)). Simply stated, preference law discourages "unusual action[s]" by a prospective debtor and its creditors or vendors. *See In re C.W. Mining Co.*, 798 F.3d at 990 (quoting *Union Bank*, 502 U.S. at 160). But a truly ordinary-course transaction is, by definition, not unusual—the prospective debtor is not "preferring" a creditor, and the creditor is not trying to beat-out other creditors in collecting a debt. The exception thus encourages continued, regular business dealings that might aid the debtor's reorganization effort.

Assessing whether a particular transaction is ordinary can be difficult. And, as stated, it requires a review of the particular facts at hand. The courts have identified several factors to consider:

- the length of time the parties were engaged in the transaction
- whether the amount or form of tender differs from past practices
- whether the payment by the debtor is unusual or the payee's collection efforts are unusual
- the circumstances under which the payment was made
- whether the creditor-transferee took advantage of the debtor's known deteriorating financial condition

*See In re C.W. Mining Co.*, 798 F.3d at 991.

The task is even more difficult if the alleged preference is a first-time deal. What is "ordinary"? Some courts have thus concluded that first-time preference transferees cannot rely on the defense of what is ordinary as between the transferee and the debtor. But the courts that have allowed the first-timer to assert the ordinary-course exception under the subjective test have recognized that the statutory language of § 547(c)(2) does not so limit the exception and that there are other ways to meet the exception. The statute does not explicitly state that, for the

13

subjective test, the deal be proved as ordinary *between* the debtor and the transferee, which would arguably require some history of dealings to satisfy. *In re C.W. Mining Co.*, 798 F.3d at 988–89. (Although courts commonly refer to the subjective test as a transaction "between" the parties.) A first-time debt may be ordinary when compared to the debtor's and the transferee's past practices with other similarly situated counterparties. *Id*. at 990. Or the parties may have a written agreement that outlines the terms of the deal. *Id*. at 991. The court in *In re C.W. Mining Co.* noted that payments may not be common but still be in the ordinary course if they do not favor certain creditors or encourage a race to dismember the debtor. *Id*. at 992–93. The inquiry under § 547(c) is whether the transaction would have occurred absent the debtor's impending bankruptcy filing. *Id*. at 988 n.3.

    The summary judgment evidence puts the transactions in perspective. Broadway seeks sponsors for the Fourth on Broadway event starting several months prior to July 4 of each year. Broadway is a non-profit entity; the Fourth on Broadway celebration is obviously a once-a-year event. Broadway's relationships and dealings with potential sponsors, particularly major sponsors, are hardly "ordinary" compared to a true vendor-vendee relationship. But what has been "ordinary" for the parties is that, upon Reagor-Dykes's promise to sponsor the fireworks, Broadway sends an "invoice" to document the promise with no expectation that the contribution will be made anytime soon. It was ordinary for Broadway's large "customers" to "pay" their invoices well beyond thirty days of being invoiced.[12]

---

[12] Customer Amigos was invoiced for $15,000 on January 12, 2018 and paid the $15,000 on April 6, 2018; customer Academy Sports was invoiced for $2,500 on April 25, 2018 and made payment on June 18, 2018; customer Civic Lubbock Inc. was invoiced for $35,115 on February 26, 2018 and paid $14,046 of the invoice on August 28, 2018 (it made an initial payment of $21,069 two days after the invoice was issued); customer Covenant Health Systems was invoiced for $15,000 on February 15, 2018 and made payment on April 6, 2018; customer FirstCapital Bank of Texas was invoiced for $5,000 on January 12, 2018 and paid the invoice on April 30, 2018; customer Lubbock Christian University was invoiced for $7,500 on March 24, 2018 and paid the invoice on July 25, 2018; customer PlainsCapital Bank was invoiced for $5,000 on January 12, 2018 and paid the invoice on April 27, 2018; customer Riversmith's was invoiced for $4,000 on January 12, 2018 and paid the invoice on April 25, 2018; and customer Tito's Handmade

For both 2017 and 2018, Reagor-Dykes was invoiced months before the July 4 event and paid the respective invoices many days beyond a typical thirty-day timeframe—90 days after the invoice (that had a "Net 30" due date) for 2017, and 60 days after the invoice for 2018. The chronology of the dates of the invoices and payments are different, but the only significant difference is that, in 2017, Reagor-Dykes paid the invoice before the July 4 fireworks show and before Broadway purchased the fireworks. In 2018, as stated, Reagor-Dykes paid on July 13, nine days after the festival and thus after Broadway purchased the fireworks. The significance of paying before or after Broadway purchased the fireworks is tenuous, however. Caldwell testified that "the delivery of the event is not conditioned upon the receipt of payment." Ex. A, Affidavit of Don Caldwell at 3 [ECF No. 20-1]. Caldwell also testified that "Broadway makes no collection efforts generally; and it made no collection efforts with regard to Reagor-Dykes specifically. Broadway made no efforts and took no steps to collect the 2018 payment made by Reagor-Dykes." *Id*. And though Caldwell further stated that the "contributions" are based on goodwill and that they gave "little … thought … whether or not [they] would receive payment," Reagor-Dykes did become obligated to pay the $25,000 after receiving the various benefits it bargained for, many of which were realized as part of the fireworks extravaganza on the evening of July 4.[13] *Id*. Broadway never demanded payment, and Reagor-Dykes was not otherwise compelled to pay Broadway. Its obligation arose on July 4 and was paid nine days later. While the facts do not align with traditional business practices, the Court finds nothing unusual or untoward from Reagor-Dykes's contribution of $25,000 to Broadway for its annual July 4

---

Vodka was invoiced for $8,500 on March 24, 2018 and paid the invoice on June 11, 2018. Ex. A-6 to Declaration of S. Kyle Woodard [ECF No. 18-1].

[13] See discussion at II above on when an obligation to pay arises.

15

celebration based on a subjective analysis of Broadway's transaction history with Reagor-Dykes and other sponsors.

The purpose of recovering preference payments under § 547 of the Code is to ensure that similarly situated creditors are treated equally and that one creditor is not "preferred" over another creditor during the debtor's slide into bankruptcy. *In re Kevco, Inc.*, 2005 WL 6443621, at *11. Reagor-Dykes made the 2018 Transfer as part of its practice of donating for community events. It agreed to participate and received numerous benefits as a result: recognition as title sponsor of the event, multiple opportunities for its presence at the event, print advertising, social media advertising presence, public promotion at the event, and complimentary VIP passes. These benefits were mostly received on July 4. For a prominent car dealership in Lubbock, Texas, this deal is as ordinary as a once-a-year deal can be. It promoted goodwill within the regional community that Reagor-Dykes served. There is no evidence that Reagor-Dykes "preferred" Broadway at the expense of any other creditor, though it likely would have sullied its reputation within the community had it not made the contribution as promised.

## Conclusion

The Court concludes that Reagor-Dykes's $25,000 contribution/payment to Broadway was made in the ordinary course of its and Broadway's affairs in planning and preparing for the annual Fourth on Broadway event in Lubbock. Reagor-Dykes made the payment at the end of the week following the event. Reagor-Dykes's bankruptcy filing two and a half weeks later was sudden and unexpected. *See In re Reagor-Dykes Motors, LP*, No. 18-50214, 2019 WL 259732, at *3 (Bankr. N.D. Tex. Jan. 17, 2019). The timing of the payment was normal when compared to other large contributors; Broadway never demanded payment; the manner, amount, and form of payment were normal under the circumstances. Nothing about the transaction was unusual.

The Court denies the Trustee's motion for summary judgment and will issue its order.

### End of Memorandum Opinion ###